IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

V.                                       Case No. 3:13-CR-3676-KG

DANIEL ENRIQUE PADILLA ESPARZA,

       Defendant.

## MEMORANDUM OPINION AND ORDER

On March 21, 2014, Defendant filed a Motion to Suppress wherein he seeks to suppress physical evidence seized from his truck by United States Border Patrol Agents without a warrant on September 13, 2013. (Doc. 29). The Court held an evidentiary hearing on the Motion to Suppress on May 27, 2014. Present at the hearing were Anna Wright, Assistant United States Attorney, and Santiago David Hernandez and Alfonso Cota, counsel for Defendant. Having considered Defendant's Motion to Suppress, the corresponding briefs, the evidence of record, and the argument of counsel at the May 27, 2014, hearing, the Court denies Defendant's Motion to Suppress.

## FINDINGS OF FACT

1. The Court heard testimony at the May 27, 2014, hearing from two United States Customs and Border Protection Officers (CBP Officers) and two United States Border Patrol Agents (BPAs).[1]

---

[1] According to the U.S. Customs and Border Protection website, a CBP Officer is primarily tasked with enforcing various laws and regulations of the United States at ports of entry, whereas a BPA enforces various laws away from the ports of entry. *See CBP Officer*, U.S. Customs and Border Protection, http://www.cbp.gov/careers/join-cbp/which-cbp-career/cbp-officer; *Border Patrol Agent*, U.S. Customs and Border Protection, http://www.cbp.gov/careers/join-cbp/which-cbp-career/border-patrol-agent.

a. The first witness to testify was CBP Officer Manuel Aguilera.  CBP Officer Aguilera has been a CBP Officer for sixteen years.  On September 7, 2013, he was assigned to the United States Department of Homeland Security Border Enforcement Security Task Force (BEST) in El Paso, Texas.  *See* Transcript of Hearing (Tr.), taken May 27, 2014, at 7.[2]

b. The second witness to testify was BPA Ivan Cervantes.  BPA Cervantes has been a BPA for eight years, including four years as a canine handler.  He has received canine training and certification with his canine in detecting concealed narcotics.  *Id.* at 43-44.

c. The third witness to testify was BPA Erik Cansino who has been a BPA for thirteen years.  *Id.* at 114.

d. The fourth witness to testify was CBP Officer Federico Guerro, Jr.  *Id.* at 156.

2.  On February 25, 2013, Defendant was traveling northbound from Mexico to the United States and applied for entry into the United States.  At that time, CBP Officers were conducting pre-primary inspections and encountered Defendant when a drug detection canine alerted to his truck.  The CBP Officers inspected Defendant's truck and found an empty, concealed, non-factory compartment in the truck.  *Id.* at 9-10.

3.  In response to discovering the non-factory compartment, the CBP Officers inputted a text alert on Defendant's truck.  Because Defendant's truck had paper license plates, the CBP Officers based the text alert only on the last eight digits of the truck's Vehicle Identification Number (VIN).  Additionally, the CBP Officers inputted a text alert on Defendant to cross-reference the truck.  *Id.* at 10.

4.  Almost six months later, on September 7, 2013, CBP Officer Aguilera was on duty at the Paso del  Norte (PDN) Port of Entry in El Paso when a CBP Officer informed CBP Officer

---

[2] The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

Aguilera that CBP Officers encountered Defendant while doing out-bound inspections. Defendant was traveling from the United States to Mexico with two pieces of luggage.[3] He declared that he was traveling with $300 in cash. After inspection of Defendant's luggage, the CBP Officers discovered approximately $2,000 in cash hidden underneath the sleeve of a camera case. As a result, the CBP Officers queried a database and discovered the February 25, 2013, text alert. *Id.* at 9-10.

    5. After CBP Officer Aguilera learned this information, he began running further inquiries into Defendant. He learned that Defendant had an established pattern of travel through the Las Cruces and Alamogordo Border Patrol checkpoints showing that Defendant traveled through each checkpoints roughly once per month. *Id.* at 10-11.

    6. Next, CBP Officer Aguilera and his partner interviewed Defendant. Defendant told them that he never traveled to Mexico. He also stated that he owned a landscaping business. CBP Officer Aguilera and his partner asked Defendant to list his last three landscaping jobs, and, in response, Defendant was not able to produce receipts, invoices, or the names of the people he allegedly did work for. *Id.*

    7. Additionally, CBP Officer Aguilera and his partner searched Defendant's truck and found numerous receipts from outlet malls located in New Mexico and El Paso. The agents asked him where he received the money for the purchases, and Defendant again was not able to provide information regarding how he earned an income. *Id.* at 11.

    8. CBP Officer Aguilera and his partner, based on their knowledge and experience, found Defendant's explanation of his landscaping work and spending habits to be significantly inconsistent. In response, CBP Officer Aguilera put a text alert on Defendant for suspected bulk

---

[3] It is unclear from CBP Officer Aguilera's testimony whether Defendant was traveling on foot or in his truck. This distinction, however, is irrelevant to the Court's analysis.

cash or drug smuggling activity.  During the course of the investigation, CBP Officer Aguilera located Defendant's truck's license plate number and inputted that information into the text alert. *Id.* at 11-12.

9.  At the same time, CBP Officer Aguilera input Defendant's information into a database set to send him an alert on his cellphone that would notify him if and when Defendant made reentry into the United States.  *Id.* at 12.

10.  On September 10, 2013, CBP Officer Aguilera received an alert on his cellphone indicating that Defendant reentered the United States from Mexico through the El Paso PDN Port of Entry.  Upon learning this information, CBP Officer Aguilera contacted the United States Custom and Border Patrol Operations Center.  The Operations Center then disseminated information regarding Defendant and his truck through a "Be On the Lookout" (BOLO) to other law enforcement agencies, including the United States Border Patrol.  *Id.* at 13.

11.  On September 13, 2013, at approximately 6:00 a.m., BPAs at the Las Cruces Border Patrol checkpoint at Interstate 25 (I-25), mile marker 26, including BPA Cervantes, held a morning meeting and discussed current BOLOs, which included the September 10, 2013, BOLO on Defendant.  The BPAs received a PowerPoint presentation that included information about the BOLO on Defendant, stating:

> BEST Manuel Aguilera informed the Operations Center that Daniel Enrique Padilla Esparza (DOB 09/08/77, A#04118929) may attempt to smuggle narcotics or currency thru the Las Cruces or Alamogordo Border Patrol Checkpoints. Subject may be driving a Gray Honda Ridgeline bearing Colorado plates 236YWY.  Vehicle has a non factory compartment on top of the gas tank. Subject last made entry into the United States on 09/10/13 at 2109 hours (MDT) through the Paso Del Norte Port of Entry.  Lookouts have been generated on subject and vehicle.  If encountered, detain and conduct intensive exam.

(Gov't ex. 2); Tr. at 47-48.

12.   On September 13, 2013, BPA Morales was working as the primary agent inspecting vehicles passing northbound through the Las Cruces Border Patrol checkpoint.  BPA Cervantes was working as the backup agent and also was monitoring the License Plate Reader (LPR), a computer programmed to check license plate numbers of approaching vehicles.  The LPR operates by photographing the vehicle and the vehicle's license plate as the vehicle approaches the checkpoint.  The LPR then displays any information relative to that vehicle, including any BOLOs placed on that vehicle.  If the LPR reads a license plate with a BOLO on the vehicle, the LPR flashes red to notify the BPA monitoring it.  Tr. at 44-45.

13.   On September 13, 2014, at roughly 12:00 p.m., Defendant approached the Las Cruces Border Patrol checkpoint driving a gray Honda Ridgeline with Colorado license plate 236YWY.  That day featured sustained, heavy rains, and it was raining when Defendant approached the checkpoint and waited in line to be inspected.  Out of concern for the safety of the long line of vehicles waiting to enter the checkpoint, BPA Morales exercised her discretion to temporarily forego inspections and waived the vehicles through the checkpoint, including Defendant's truck.  BPA Morales, therefore, did not inspect Defendant's truck.  *Id.* at 45-46; 99-100.

14.   When Defendant entered the ramp leading into the checkpoint, the LPR read his truck's license plate.  The LPR retrieved a positive hit based on the September 10, 2013, BOLO, began flashing red, and displayed the relevant information regarding the BOLO.  BPA Cervantes saw the LPR's screen flashing red and, without reading the information on the screen, informed BPA Morales that a vehicle on the ramp had a BOLO on it.  BPA Morales stopped traffic at the checkpoint in order to locate the vehicle that was the subject of the BOLO.  BPA Cervantes did not see the BOLO vehicle lined-up to enter the checkpoint.  He immediately looked towards the

5

ramp leading away from the checkpoint and saw Defendant's silver Honda Ridgeline driving away.  Agent Cervantes, remembering the PowerPoint slide from that morning, identified Defendant's truck and informed BPA Morales that he believed the BOLO vehicle had gone through the checkpoint.  *Id.* at 46-47; 62.

15.  At that time, BPAs Cansino and Gary Adams were standing outside of the checkpoint.  Agent Cervantes informed them that the gray Honda Ridgeline that BPA Morales waived through was the subject of a BOLO that was mentioned in the morning meeting.  *Id.* at 49.

16.  BPA Cervantes entered his unmarked service truck and proceeded after Defendant's truck.  BPA Cervantes's drug detection canine was in his truck.  Agent Cervantes only briefly glanced at the LPR's screen as he began to pursue Defendant.  As a result, he did not remember the BOLO subject's name or the vehicle's license plate number.  *Id.* at 49-50.

17.  BPAs Cansino and Adams also pursued Defendant in a marked sedan.  At that time, BPA Cansino was only aware that the vehicle he was pursuing was a gray Honda Ridgeline truck with a Colorado license plate.  While en route, BPA Cansino called dispatch to run a check on Defendant's license plate.  BPAs Cansino and Adam's vehicle caught up to Defendant's truck before BPA Cervantes.  *Id.* at 50, 116.

18.  At approximately 12:04 p.m., BPAs Cansino and Adams stopped Defendant's truck at I-25, mile post 41, approximately fifteen miles north of the Las Cruces Border Patrol checkpoint.  BPA Adams reported to dispatch that they stopped a truck bearing Colorado license plate 236 YWY.  BPA Cansino then approached Defendant's truck and observed that Defendant appeared nervous.  When BPA Cansino arrived at the driver's side window of the truck, Defendant already had his driver's license and Permanent Resident Alien (LPRA) card in his

hand and asked whether he was speeding.  BPA Cansino quickly looked through the windows of

Defendant's truck to confirm that Defendant was the only occupant.   BPA Cansino collected

Defendant's documents and began walking towards his service vehicle to run a search on the

documents.  (Gov't Ex. 7); Tr. at 109, 118.

19.  As BPA Cansino returned from Defendant's truck, BPA Cervantes arrived at the

traffic stop.  Agent Cervantes immediately approached BPA Cansino and stated that Defendant's

truck was not the correct one because the BOLO described a truck with a New Mexico license

plate, not a Colorado license plate.  *Id.* at 53-54.

20.  At approximately 12:05 p.m., dispatch reported back to BPA Adams that the check

of Defendant's truck returned clear, indicating that it was not stolen and had no BOLOs on it.  It

is unclear whether BPA Adams relayed this information to BPA Cansino.  (Gov't Ex. 7); Tr. at

104-105.

21.  Within a minute of pulling over Defendant, BPA Cansino returned Defendant's

documents.  BPA Cansino did not run the documents through dispatch to conduct a search.  *Id.* at

119 -120.  BPA Cansino subsequently released Defendant, and Defendant proceeded to merge

back on to I-25.

22.  As Defendant re-entered I-25, BPA Adams again contacted dispatch regarding the

BOLO.  Dispatch informed Agent Cansino that Defendant's truck was in fact the correct truck

and that Defendant's Colorado license plate was the same plate that was the subject of the

BOLO.  *Id.* at 54-56.

23.  After learning this information, BPA Cervantes returned to his service truck, and the

three BPAs re-pursued Defendant in their respective vehicles.   At approximately 12:07 p.m.,

BPAs Cansino and Adams came behind Defendant's truck and stopped it at I-25, mile marker

43, approximately two miles north of the first stop.  BPA Adams reported to dispatch that the agents stopped Defendant's truck for a second time.  *Id.* at 150.

24.  BPA Cansino approached Defendant and made initial inquiries.  BPA Cansino then asked Defendant for permission to perform a canine search of his truck.  Defendant stated that he had no problem with a canine search of his truck.  BPA Cansino then requested that Defendant exit his truck, and he walked Defendant to the rear of the truck.  *Id.* 121-123.

25.  BPA Cervantes, with his drug detection canine in his truck, arrived while BPA Cansino walked Defendant to the rear of Defendant's truck.  BPA Cansino notified BPA Cervantes that Defendant consented to a canine search.  BPA Cervantes then also asked Defendant for consent to a canine search of his truck, and Defendant again consented.  *Id.* at 56-57.

26.  After receiving consent to perform a canine search, BPA Cervantes removed his canine from his truck.  BPA Cervantes performed a canine search, beginning with the rear passenger's side taillight and moving counterclockwise around the truck.  BPA Cervantes's canine alerted to the passenger's side rear wheel well and attempted to get at the area underneath the truck in front of the rear tire.  The canine was trained to detect the odor of narcotics and was last certified in July, 2013.  *Id.* at 58-59.

27.  BPA Cervantes advised BPA Cansino that the dog had alerted.  The BPAs informed Defendant of the alert, and Defendant stated that he smoked marijuana which likely caused the alert.  The BPAs informed Defendant that they were going to search the truck, and Defendant consented to the search.  *Id.* at 59.

28.  Due to the inclement weather, BPA Cervantes asked Defendant if he would agree to follow the BPAs back to the Las Cruces Border Patrol checkpoint, roughly seventeen miles

8

south, to conduct the search.  Defendant agreed to do so.  The BPAs did not inspect the inside of

Defendant's truck at mile marker 43.  *Id.* at 59, 93.

29. At approximately 12:15 p.m., the BPAs escorted Defendant to the Las Cruces Border

Patrol checkpoint.  BPAs Cansino and Adams drove their patrol vehicle in front of Defendant,

and BPA Cervantes drove his vehicle behind Defendant.  At the checkpoint, BPA Cervantes

searched Defendant's truck, discovering the concealed, non-factory compartment.  BPA

Cervantes then discovered clear vacuum sealed packages containing 35.2 pounds of cocaine.

After the cocaine was discovered, the BPAs placed Defendant under arrest and advised

Defendant of his *Miribanda*[4] rights.  *Id.* at 60-61; 96-97; 126.

<u>DEFENDANT'S MOTION TO SUPPRESS</u>

On November 13, 2013, a grand jury charged Defendant with intentionally possessing

with intent to distribute five kilograms and more of cocaine in violation of 21 U.S.C. §§

841(a)(1) and (b)(1)(a), and aiding and abetting under 18 U.S.C. § 2.  *See* (Doc. 15).  Defendant

now moves the Court to suppress all physical evidence seized from his truck on September 13,

2013.

Defendant makes seven primary arguments for the Court to suppress the evidence.  First,

Defendant argues that CBP Officer Aguilera did not have reasonable suspicion to issue the

September 10, 2013, BOLO on Defendant's truck.  Second, Defendant argues that the first stop

of Defendant's truck was not justified at its inception because the BPAs lacked authority to stop

his truck based on the invalid BOLO alert.  Third, Defendant argues that the BPAs did not have

reasonable suspicion for the second stop, and that the second stop was not reasonable in duration

and scope.  Fourth, Defendant contends that his transportation to the Las Cruces Border Patrol

---

[4] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

checkpoint constituted a *de facto* arrest and the BPAs lacked the requisite probable cause to arrest.  Fifth, Defendant argues that the BPAs lacked authority to stop his truck because BPAs have statutory authority to enforce only immigration laws, and the BPAs here had no reason to believe Defendant's truck contained illegal aliens.  Sixth, Defendant argues that "[e]ven assuming the Border Patrol Agents did have the authority to pursue the investigation of a BOLO beyond their Immigration Checkpoint, they could not pursue the investigation of a BOLO, not alleging an illegal immigrant, or any other suspect for that matter, more than 100 miles past the border or checkpoint."  Doc. 29 at 7.  Finally, Defendant argues that agents acted with "flagrant misconduct."  *Id.* at 12.

## CONCLUSIONS OF LAW

The Court first will determine whether the witnesses that testified at the May 27, 2014, hearing were credible.  The Court next will focus on each of Defendant's arguments.

### I. THE COURT FINDS THE WITNESSES CREDIBLE

1. "Where a motion to suppress evidence is heard, the credibility of the witnesses and the weight to be given the evidence, together with inferences, deductions, and conclusions fairly and reasonably to be drawn from the evidence, are to be determined by the trial judge." *United States v. Rios*, 611 F.2d 1335, 1344 n.13 (10th Cir. 1979) (internal citations and quotations omitted). *See also United States v. Harris*, 313 F.3d 1228, 1233 (10th Cir. 2002) ("When reviewing a district court's denial of a motion to suppress evidence, we accept the district court's factual findings and determinations of witness credibility unless they are clearly erroneous.") (internal citations and quotations omitted).

2. The Court finds and concludes that CBP Officer Aguilera, CBP Officer Guerrero, Jr., BPA Cervantes, and BPA Cansino's testimony was credible.

II. THE SEPTEMBER 10, 2013, BOLO WAS PROPERLY ISSUED

3.   Defendant argues that CBP Officer Aguilera issued the September 10, 2013, BOLO based on a hunch that Defendant may have been smuggling currency or narcotics.  The United States responds by arguing that CBP Officer Aguilera had reasonable suspicion that Defendant may be involved in smuggling and issued the BOLO on Defendant and his truck accordingly.

4.   The Supreme Court has held that,

> if a flyer or bulletin has been issued on the basis of articulable facts supporting a reasonable suspicion that the wanted person has committed an offense, then reliance on that flyer or bulletin justifies a stop to check identification, to pose questions to the person, or to detain the person briefly while attempting to obtain further information.

*United States v. Hensley*, 469 U.S. 221, 232 (1985).  When determining whether reasonable suspicion exists, the Court looks to the totality of the circumstances to see whether the officer had a particularized and objective basis for suspecting wrongdoing.  *United States v. Bradford*, 423 F.3d 1149, 1157 (10th Cir. 2005).  Reasonable suspicion does "not rise to the level required for probable cause, and its falls considerably short of satisfying a preponderance of the evidence standard." *United States v. Arvizu*, 534 U.S. 266, 274 (2002).  Although the Court gives deference to a law enforcement officer's ability to distinguish between innocent and suspicious actions, it must also keep in mind that "inchoate suspicions and unparticularized hunches do not provide reasonable suspicion."  *United States v. Salzano*, 158 F.3d 1107, 1111 (10th Cir. 1998) (internal quotations omitted).

5.   The question before the Court regarding whether the September 10, 2013, BOLO was properly issued, therefore, is whether CBP Officer Aguilera issued it based on "articulable facts supporting a reasonable suspicion that the wanted person has committed an offense."  CBP Officer Aguilera testified that he issued the BOLO primarily based on three sets of facts that

indicated the possibility of bulk cash or drug smuggling activity: (1) the February 25, 2013, canine alert and discovery by CBP Officers of the hidden, non-factory compartment on Defendant's truck; (2) the September 7, 2013, discovery by BPAs of hidden, unclaimed money in Defendant's luggage and subsequent interview of Defendant by CBP Officer Aguilera and his partner; and (3) Defendant's travel habits which revealed an established pattern of travel through the Las Cruces and Alamogordo Border Patrol checkpoints.

6.   CBP Officer Aguilera, a sixteen-year veteran of United States Customs and Border Protection, testified that, based on the evidence available to him, he had reason to believe that Defendant may be involved in currency or narcotic smuggling.  Although Defendant's actions may have innocent explanations, "there could, of course, be circumstances in which wholly lawful conduct might justify the suspicion that criminal activity was afoot." *United States v. Sokolow*, 490 U.S. 1, 9 (1989) (citation omitted).  In this case, CBP Officer Aguilera testified that currency and drug smugglers are known to hide contraband in hidden, non-factory compartments.  Further, a dog alerted to a hidden compartment on Defendant's truck, indicating that Defendant may have stored currency or narcotics in the compartment at one time. Additionally, CBP Officer Aguilera testified that it is indicative of currency or drug smuggling for a person not to declare the full amount of cash that he is carrying across the border.  *See* Tr. at 33.  CBP Officer Aguilera also found significant inconsistencies regarding Defendant's inability to give specifics regarding his landscaping business coupled with Defendant's spending habits at outlet malls.  Finally, CBP Officer Aguilera's research into Defendant's established travel habits was consistent with bulk cash or drug smuggling activity.

7.   The Court concludes that, under the totality of the circumstances, the facts available to CBP Officer Aguilera were sufficient to allow him to form an objectively reasonable and

articulable suspicion that illegal activity would occur.  Further, the Court concludes that CBP

Officer Aguilera's belief was based on more than inchoate suspicions and unparticularized

hunches.  Therefore, CBP Officer Aguilera had reasonable suspicion to issue the September 10,

2013, BOLO on Defendant and his truck.

III. BPAs' FIRST STOP OF DEFENDANT WAS BASED ON REASONABLE SUSPICION,
WAS REASONABLE IN SCOPE, AND, THEREFORE, WAS VALID

8.  Defendant argues that BPAs Cansino and Aguilera did not have reasonable suspicion

to stop Defendant the first time, and, therefore, the BPAs violated Defendant's Fourth

Amendment rights.  The United States responds by arguing that the BPAs had reasonable

suspicion to stop Defendant based on the September 10, 2013, BOLO on Defendant's truck.

9.  The Fourth Amendment to the United States Constitution guarantees "[t]he right of

the people to be secure in their persons, houses, papers, and effects, against unreasonable

searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable

cause."  U.S. Const. amend. IV.  The Supreme Court has recognized that "police may, consistent

with the Fourth Amendment, briefly stop a moving automobile to investigate a reasonable

suspicion that its occupants are involved in criminal activity."  *United States v. Gonzales*, 897

F.2d 504, 506 (10th Cir. 1990) (citation omitted).

10.  An investigative stop that was neither consensual nor the result of probable cause

must fulfill two requirements: (1) the stop must be "justified at its inception," and (2) the

resulting detention must be "reasonably related in scope to the circumstances which justified the

interference in the first place."  *United States v. Shareef*, 100 F.3d 1491, 1500–01 (10th

Cir.1996) (quoting *Terry v. Ohio* 392 U.S. 1, 20 (1968)).  To be justified at its inception, an

investigatory stop "must be justified by some objective manifestation that the person stopped is,

or is about to be, engaged in criminal activity."  *Id.* (citing *United States v. Cortez*, 449 U.S. 411

(1981)).  A BOLO properly issued by a law enforcement agency "may serve as just such

'objective manifestation.'"  *Gonzales*, 897 F.2d at 506.

11.  As discussed above, where an officer makes a stop on the basis of another officer's

BOLO, the "evidence uncovered in the course of the stop is admissible if the police who *issued*

the … bulletin possessed a reasonable suspicion justifying the stop." *Gonzales*, 897 F.2d at 506

(quoting *Hensley*, 469 U.S. 221, 233 (1985)).  Hence, the relevant inquiry is whether the officer

who issued the alert had the requisite level of suspicion, not whether the officer making the stop

independently had reasonable suspicion.  *See United States v. Whitley*, 680 F.3d 1227, 1234

(10th Cir. 2012); *United States v. Wilkinson*, 633 F.3d 938, 941 (10th Cir. 2011).  Officers

relying on a properly issued BOLO may stop an individual to "check identification, pose

questions to the person, or to detain the person briefly while attempting to obtain further

information." *Hensley*, 469 U.S. at 232.

12.  BPAs Cansino and Adams' stop of Defendant at I-25, mile marker 41, was justified

at its inception.  As discussed above, CBP Officer Aguilera, the BOLO-issuing officer, had

reasonable suspicion to issue the September 10, 2013, BOLO.  BPAs Cansino and Adams relied

on the BOLO to stop Defendant at mile marker 41.  Therefore, the BPAs had reasonable

suspicion to stop Defendant.

13.  Additionally, the scope of the first stop was proper.  After stopping Defendant, BPA

Cansino checked Defendant's identification and posed routine questions to him, actions within

the boundaries of a traffic stop based on a BOLO.  The entire stop lasted less than three minutes.

Consequently, BPAs Cansino and Adams's first stop of Defendant was justified at its inception

and reasonable in scope, and, therefore, it did not violate Defendant's Fourth Amendment rights.

IV. THE BPAs' SECOND STOP OF DEFENDANT WAS JUSTIFIED AT ITS INCEPTION,
REASONABLE IN DURATION AND SCOPE, AND, THEREFORE, WAS VALID

14.  Defendant contends that BPAs Cansino, Adams, and Cervantes' second stop of

Defendant violated the Fourth Amendment because the BPAs dispelled reasonable suspicion

during the first stop and learned no new information to warrant reasonable suspicion for the

second stop.  The United States counters arguing that the BPAs did not dispel reasonable

suspicion during the first stop, and, if they did, the BPAs learned new information, *i.e.*, the

proper state of the license plate, before making the second stop.

15.  There is no "per se rule prohibiting successive investigatory stops," although the

second stop is "inherently more intrusive and coercive than the first."  *United States v. Ilazi*, 730

F.2d 1120, 1126 (8th Cir.1984).

16.  Defendant relies on *United States v. Peters*[5] to argue that the second stop was

improper because "an Officer having performed an investigation subsequent to an investigatory

stop of a suspect may not release the suspect, wait until the suspect has travelled down the road

several miles, then make a second *Terry* stop based only on conduct that has already proved to be

illusory." (Doc. 29) at 12-13.  In *Peters*, two defendants were convicted of unlawful possession

of identification documents and false representation of citizenship after evidence was discovered

following two separate traffic stops of the defendants' rental truck. 10 F.3d at 1518.  Officer

Martin made the first stop in Flagstaff, Arizona after observing the rental truck weaving across

the center line.  *Id.* at 1519.  The defendants told Martin they were students moving from

California to Dallas. *Id.*  A computer check of their drivers' licenses showed no irregularities.  *Id.*

The defendants were "extremely nervous," and Martin decided to investigate the possibility that

the defendants were nervous because they were hauling illegal drugs.  The defendants consented

---

[5] 10 F.3d 1517 (10th Cir. 1993).

to a search of the moving truck.  *Id.*  Martin searched the truck and found no evidence of drugs or other illegal activity and permitted the defendants to go on their way.

17.  Immediately after the encounter, Martin reported to his superior that he was not satisfied with his search because of the suspects' nervousness and his failure to obtain a drug-sniffing dog.  *Id.*  The matter was referred to Agent Ochoa at a Border Patrol station in Albuquerque, New Mexico.  *Id.* at 1520.  Ochoa intercepted the defendants' truck, pulled alongside it, and observed both defendants looking straight ahead.  The defendant in the passenger side kept glancing at Ochoa out of the corner of his eye.  *Id.*  Based on this behavior, Ochoa stopped the truck, obtained permission to search the truck, and searched it.  *Id.*  Ochoa additionally examined the wallet of one of the defendants, which contained a counterfeit social security card.  *Id.*  A thorough search of defendants' truck revealed false identification documents hidden in a suitcase.  *Id.*

18.  The Tenth Circuit Court of Appeals stated that the only relevant question was whether Ochoa had an objective and particularized basis for his suspicions that was reasonable and sufficient to justify the second stop.  *Id.* at 1521. The Tenth Circuit held that the second stop was not valid, explaining that:

> when reasonable suspicion has been dispelled or probable cause has not developed, the conduct upon which the officer originally based his suspicions has proved to be an illusory ground for suspicion under the particular circumstances, and thus, has been exhausted. Being illusory, the ground no longer reasonably supports a continuation of the search. Absent a new and independent basis for suspicion, the officer must halt his investigation.

*Id.* at 1522.  Applying these principles, the Tenth Circuit stated that:

> a second officer who is unaware of the fruitless search conducted earlier may initiate his own investigation based on the same 'suspicious' behavior that was exhausted by the first officer's failed investigation. The officer who performed the original investigation, however, may not release the suspect … , wait until he has

16

travelled down the road a few miles, and then make a second *Terry* stop based
solely on the conduct that has already proved to be illusory.

*Id.*

19.  BPAs Cansino, Adams, and Cervantes' second stop of Defendant was justified at its

inception.  The present case differs significantly from the facts in *Peters* because there was no

initial, fruitless search.  In *Peters*, the officer initially stopped the defendants based on the

reasonable suspicion that they were transporting drugs.  Armed with this reasonable suspicion,

the officer exhausted his belief that the defendants were transporting drugs after the officer fully

searched the defendants' moving truck, uncovering no contraband.  After that point, the officer

or any subsequent officer, could not base a search of the defendants' moving truck on the

reasonable suspicion gained by the original officer.  In the present case, at the initial stop, the

BPAs had reasonable suspicion that Defendant was smuggling narcotics or currency based on the

September 10, 2013, BOLO on Defendant and his truck.  The only search conducted on

Defendant's truck at the first stop was a quick check to determine whether Defendant was the

only occupant.  The BPAs' reasonable suspicion was not exhausted by a full search, and the

reasonable suspicion remained after the BPAs abruptly ended their initial stop.  Because the

BPAs' reasonable suspicion remained, they properly could pull Defendant over again after they

learned his truck was the subject of the BOLO.

20.  Finally, the scope and duration of the second stop were reasonable.   When an officer

stops a motorist for a particular purpose and that purpose is satisfied, further detention or

questioning of the motorist exceeds the scope of the stop's underlying justification.  *See United

States v. McSwain*, 29 F.3d 558, 561 (10th Cir. 1994).  The BPAs had reasonable suspicion to

stop Defendant based on the September 10, 2013, BOLO.  Based on a BOLO, an officer may

check a person's identification, pose questions to the person, or detain the person briefly while

attempting to obtain further information. *See Hensley*, 469 U.S. at 232. The BPAs stayed within these bounds and, only after Defendant consented twice to a canine search, ran the drug sniffing canine around the exterior of Defendant's truck. Further, "[a] canine sniff on the exterior of a vehicle during a lawful traffic stop does not implicate legitimate privacy interests." *United States v. Williams*, 403 F.3d 1203, 1207 (10th Cir. 2005) (citing *Illinois v. Caballes*, 543 U.S. 405 (2005)). Finally, the second stop lasted roughly eight minutes. Hence, BPAs Cansino, Cervantes, and Adams' stop and search of Defendant's truck at I-25, mile maker 43 was reasonable in its scope and duration. Consequently, because the BPAs' second stop was justified at its inception and reasonable in scope and duration, it did not violate Defendant's Fourth Amendment rights.

## V. BPAs HAD PROBABLE CAUSE TO ARREST DEFENDANT

21. Defendant argues that BPAs Cansino, Adams, and Cervantes *de facto* arrested Defendant after the canine alerted but did not have probable cause to do so. Defendant further contends that, if the BPAs had probable cause to arrest him when the canine alerted, they would have arrested him at the second stop rather than request that he drive his truck to the Las Cruces Border Patrol checkpoint. The United States responds by arguing that the BPAs obtained probable cause to arrest after the drug sniffing canine alerted, but the BPAs were not required to search Defendant's truck at the side of the road in the rain.

22. "[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) (citation omitted). Whether probable cause exists "depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Id.* Once a dog alerts to the presence of narcotics, law

18

enforcement agents have probable cause that a criminal offense is being committed. *Williams*, 403 F.3d at 1207.

23. During the lawful detention of Defendant during the second stop, BPA Cervantes retrieved a trained canine from his service vehicle and conducted a canine search on the exterior of Defendant's truck. The canine alerted to a portion of Defendant's truck.

24. After the canine alerted, the BPAs had probable cause to further search Defendant's truck or arrest him. The BPAs used their discretion to search Defendant's truck back at the checkpoint due to the weather. It is well established that once an officer has probable cause to search a vehicle, the vehicle can be searched at a different location. *See, e.g., United States v. Lopez*, 777 F.2d 543, 550 (10th Cir. 1985) (discussing police officers who have probable cause to search vehicle and where driver was aware of purpose can conduct further searches at police station). Additionally, the Supreme Court has acknowledged that "there are undoubtedly reasons of safety and security that would justify moving a suspect from one location to another during an investigative detention." *Florida v. Royer*, 460 U.S. 491, 504-05 (1983). It is clear that BPAs Cansino, Adams, and Cervantes were armed with probable cause to pursue the search of Defendant's truck or arrest Defendant when they requested that he accompany them to the Las Cruces Border Patrol checkpoint. The BPAs also explained to Defendant the reasons why they were moving the search to the Border Patrol checkpoint. In sum, "[b]ecause the stop and detention were based upon reasonable suspicion, and the canine sniff provided probable cause for the search, [the agents] did not violate the Fourth Amendment." *Williams*, 403 F.3d at 1207.

## VI. THE BPAs HAD AUTHORITY TO STOP DEFENDANT'S TRUCK

25. Defendant argues that that BPAs Cansino, Cervantes, and Adams did not have the authority to pull over Defendant's truck because: (1) the BPAs have statutory authority to

enforce only immigration laws, not drug related offenses; and (2) the BPAs could not pursue the investigation of a BOLO more than 100 miles past the border or checkpoint.

26.  "Border Patrol agents may make roving stops on the basis of reasonable suspicion of any criminal activity, and are not limited to suspicion of violation of immigration laws." *United States v. Perkins*, 352 F.3d 198, 200 (5th Cir. 2003) (citation omitted); *see also Cortez*, 449 U.S. at 421–22 (Border Patrol stops are permissible where, "based upon the whole picture, ... experienced Border Patrol officers[ ] could reasonably surmise that the particular vehicle they stopped was engaged in *criminal activity*." (emphasis added)).  BPAs Cansino, Adams, and Cervantes, therefore, had the authority to pull over Defendant for suspicion of drug smuggling.

27.  Congress has authorized BPAs to search vehicles "within a reasonable distance from any external boundary of the United States."  8 U.S.C. § 1357(a)(3).  Current regulations define "reasonable distance" as 100 air miles from the border.  8 C.F.R. § 287.1(a)(2).  The Tenth Circuit has nevertheless held that the regulation does not foreclose searches beyond that limit. *See United States v. Leyba*, 627 F.2d 1059 (10th Cir. 1990) (upholding stop at 124 road miles from border).  Neither side presented evidence of the distance from I-25, mile markers 41 and 43 to the Mexican-American border.  The Court, however, takes judicial notice that these mile markers are within 100 air miles from the border.  Therefore, the BPAs had authority to search Defendant's truck.

28.  Accordingly, BPAs Cansino, Adams, and Cervantes had the authority to stop Defendant on suspected drug smuggling and were within their jurisdiction to do so.

VII. THE BPAs DID NOT ACT WITH FLAGRANT MISCONDUCT

29.  Finally, Defendant argues that agents acted with "flagrant misconduct." Doc. 29 at 12.  In *Peters*, discussed above, the Tenth Circuit held that the agents, by "[a]cting solely on an

unsupported, inarticulable 'hunch' supplied by another officer, after the suspects have already been exonerated by a previous investigation," acted with "flagrant misconduct under the Fourth Amendment."  10 F.3d at 1523.

30.  In the present case, the BPAs' actions did not constitute misconduct, much less "flagrant misconduct."  BPA Morales used her discretion to waive through Defendant at the checkpoint. *See United States v. Quintana*, 13 F.3d 407 (10th Cir. 1993) (unreported opinion) (decisions to "waive a vehicle through the checkpoint and not subject the vehicle to inspection … are solely within the discretion of each border patrol agent").  BPA Cervantes did not realize Defendant's truck passed through the checkpoint until after he learned of the BOLO, and he instantly notified fellow BPAs.  The BPAs stopped Defendant's truck based on their reasonable belief that it was the subject of the BOLO. The BPAs' decision to release Defendant during the first stop was based on an innocent mistake.  Finally, the second stop was only conducted immediately after the BPAs learned of their mistake.  The actions of the BPAs were legal and do not constitute "flagrant misconduct."

<u>CONCLUSION</u>

The September 10, 2013, BOLO issued by CBP Officer Aguilera was based on a reasonable suspicion that Defendant would engage in illegal activity.  Based on the BOLO, BPAs Cansino, Adams, and Cervantes stopped Defendant at I-25, mile marker 41.  Because the BOLO was issued based on reasonable suspicion, the BPAs stop was justified at its inception and reasonable in scope.  After a misunderstanding over the state of the license plate of the BOLO vehicle, the BPAs released Defendant without searching his truck and, therefore, without exhausting their reasonable suspicion that he was smuggling currency or narcotics.  After learning that Defendant's truck's license plate actually matched the BOLO, BPAs Cansino,

Adams, and Cervantes immediately stopped Defendant again.  Because the BPAs still had

reasonable suspicion that Defendant was smuggling currency or narcotics, the second stop was

justified at its inception and reasonable in scope.  Defendant then consented twice to a canine

search of the exterior of his truck, and the canine alerted.  At that point, the BPAs had probable

cause to further search Defendant's truck or to arrest him.  The BPAs were within their

discretion to have Defendant drive his own truck back to the Las Cruces Border Patrol

checkpoint and searched the truck finding narcotics.  The BPAs, therefore, did not violate

Defendant's Fourth Amendment rights.  Based on the Court's Findings of Fact and Conclusions

of Law herein set forth, it denies Defendant's Motion to Suppress.

      IT IS, THEREFORE, ORDERED that Defendant's Motion to Suppress (Doc. 29) is

DENIED.

                                       _____

                                    UNITED STATES DISTRICT JUDGE